## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

———————————————————————   )
**LINDA QUEEN,**                           )
**1485 Skinners Turn Road,**               )
**Owings, Maryland 29736,**                )
                                           )
    **Plaintiff,**     )
                                           )
    **v.**               )    **Civil Action No. 15-cv-233**
                                           )
**THE GEORGE WASHINGTON**                  )
**UNIVERSITY,**                            )
**2100 Pennsylvania Avenue, NW**           )
**Washington, Dc 20052**                   )
                                           )
    **Defendant.**      )
———————————————————————   )

### COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MONETARY RELIEF AND JURY DEMAND

### INTRODUCTION

1. This is an action against Defendant, The George Washington University ("Defendant" or "the University"), for declaratory and injunctive relief and monetary damages.  This Complaint seeks to redress harm that Plaintiff, Ms. Linda Queen ("Plaintiff or "Ms. Queen"), suffered as a result of the University's discriminatory conduct based on her sex, retaliation, and constructive discharge.

### JURISDICTION AND VENUE

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because the parties reside in different jurisdictions and the amount in controversy exceeds $75,000.00.  Plaintiff is a Maryland resident and Defendant's headquarters are Washington, D.C.  Plaintiff seeks damages not less than $100,000.

3.  Venue is proper under 28 U.S.C. § 1391(b)(2), as the events or omissions giving rise to

    Plaintiff's claims occurred in the District of Columbia.

## PARTIES

4.  Plaintiff, Linda Queen, is an adult resident of Maryland, and was at all times relevant to this

    Complaint an employee for Defendant The George Washington University.

5.  Defendant, The George Washington University, is a privately-owned education institution

    located in Washington, D.C.  The George Washington University Police Department

    ("GWPD"), where Ms. Queen worked, is an agency of the University.  At all times relevant

    to this Complaint, the University was Ms. Queen's employer.

## FACTUAL ALLEGATIONS

6.  Ms. Queen started working at the University in September 2011 and successfully completed

    her training on December 31, 2011.

7.  Ms. Queen holds a Bachelor's Degree in Criminal Justice with a minor in Psychology.

<u>Supervisors Subject Ms. Queen to Sexual Harassment</u>

8.  The University assigned Ms. Queen to train with Master Patrol Officer Todd Ladson.

9.  Mr. Ladson frequently told jokes of a strong sexual nature to Ms. Queen which made her feel

    uncomfortable.

10. One evening at the Potomac House Residence Hall, Mr. Ladson made insinuations about

    officers in the department expressing a sexual interest in her.

11. Mr. Ladson told Ms. Queen that if he were younger, he would "hit it" too.

12. After Ms. Queen's training ended on December 31, 2011, Mr. Ladson made a comment

    stating that Ms. Queen had a sexual relationship with Officer Tiffany Justice due to their

    relationship.

2

13. After Ms. Queen's training ended on December 31, 2011, Mr. Ladson made several
comments to individuals in the department about Ms. Queen's sexual orientation.

14. After completing her training on December 31, 2011, Ms. Queen was assigned as a Special
Police Officer to the overnight, or "A" shift.

15. On the A shift, Senior Corporal Warren Gibbs was Ms. Queen's second-line supervisor and
Sergeant Christopher Brown was Ms. Queen's third-line supervisor.

16. Starting in January 2012, Mr. Gibbs and Mr. Brown assigned Ms. Queen to campus patrols
even though patrol assignments are rarely given to new officers.  Mr. Gibbs and Mr. Brown
had constant access to and control over Ms. Queen when she was assigned to campus patrols.

17. Though not part of their job duties, Mr. Gibbs and Mr. Brown frequently followed Ms.
Queen while she worked on campus patrols.

18. Mr. Gibbs and Mr. Brown often summoned Ms. Queen to the security office for non-work
related reasons.  Mr. Gibbs and Mr. Brown would not have been able to order Ms. Queen to
report to the security office if she had been assigned to a fixed post as most ordinary new
officers are.

19. When Ms. Queen arrived at the security office, Mr. Gibbs and Mr. Brown told Ms. Queen
that she was not actually needed and order her to return to her patrol.  Other times, Mr. Gibbs
and Mr. Brown pressured Ms. Queen to stay and spend time with them.

20. Several officers made comments to Ms. Queen believing that she was dating Mr. Gibbs or
Mr. Brown, or both, due to their constant contact with her.

21. These comments included remarks to the effect that Mr. Brown was "in love" or "infatuated"
with Ms. Queen.

22. On several occasions, Mr. Brown asked Ms. Queen to have coffee or breakfast with him.

23. On one occasion, Mr. Brown asked Ms. Queen if she had been to a certain restaurant, and if she wanted to go with him on her birthday.

24. Ms. Queen was never interested in dating Mr. Brown and attempted to make her feelings known without jeopardizing her professional relationship with Mr. Brown as her supervisor.

25. On several occasions, Mr. Gibbs also approached Ms. Queen about going out with him.

26. Ms. Queen was never interested in dating Mr. Gibbs and attempted to make her feelings known without jeopardizing her professional relationship with Mr. Gibbs as her supervisor.

27. Nevertheless, Mr. Gibbs made several comments referencing sex to Ms. Queen including, but not limited to:

- "You have an attitude because you're not getting any (sex)."

- "I know you and Mickey Bigg (another security officer) are having sex."

- "Have you seen his (Bigg's) penis?"

- "You can't tell me you haven't seen his (Bigg's) penis."

- "Have you fucked him (Bigg) yet?"

- Comments that Ms. Queen "needed dick" because she was "too uptight" and would "pass out right after."

- Comments describing his own "dick" to Ms. Queen.

- Moaning "Oh Warren, oh Warren!" supposedly mimicking the reaction of his sexual partners.

28. Many, if not all, of Mr. Gibbs's comments were made when Ms. Queen was isolated at her post, which she was strictly constrained and not allowed to leave, or when Mr. Gibbs asked Ms. Queen to ride with him and get coffee in his supervisor vehicle.

29. Ms. Queen would change the subject every time Mr. Gibbs would make these kinds of comments.

30. In February 2013, Ms. Queen was standing in the break room when Mr. Gibbs approached her from behind.

31. Mr. Gibbs proceeded to wrap his arms around her torso, constricting her arms, and pressing his chest and groin against her backside as she struggled, unsuccessfully, to move her arms and get away from him.  He began to swing her around.

32. In another Instance, Mr. Gibbs said, "So you're not going to say 'hi' to me? When you see me you need to say 'Hi Senior Corporal Gibbs.'"  Ms. Gibbs did not release Ms. Queen until she complied and said, "Hi Senior Corporal Gibbs."

33. On March 27, 2013, Mr. Gibbs told Ms. Queen at a meeting in the roll call room, "It's fuck with Linda Queen day," dropped clip boards in her lap, and placed his leg in her lap.

34. During the roll call meeting, Mr. Gibbs ordered Ms. Queen to turn around.  He came up behind her, removed a piece of lint from her shoulder, and said, "Let me find out if you wear wigs."

<u>Ms. Queen Files Repeated Complaints with the University</u>

35. Several officers saw Mr. Gibbs's interaction with Ms. Queen on March 27, 2013 and reported it to the union.

36. With the help of the union, Ms. Queen filed a complaint with the University's Human Resources Department.

37. On March 29, 2013, Ms. Queen met with Tara Pereira, the Sexual Harassment Response Coordinator, and Suzanna Williams-Valentine from Human Resources.

38. During this initial meeting, Ms. Queen told Ms. Pereira and Ms. Williams-Valentine that she was extremely stressed as a result of the harassment from both Mr. Gibbs and Mr. Brown.

39. Ms. Queen also expressed concern to Ms. Pereira and Ms. Williams-Valentine that she would not be able to come to work and that she did not want to work with Mr. Brown.

40. On April 2, 2013, Ms. Queen met with Ms. Pereira and Ms. Williams-Valentine again to discuss the harassment from Mr. Gibbs and Mr. Brown.

41. On April 4, 2013, Ms. Queen met with Ms. Pereira and Ms. Williams-Valentine for a third time to discuss the harassment from Mr. Gibbs and Mr. Brown.

42. On April 10, 2013, Ms. Queen emailed Ms. Williams-Valentine about her options for a leave of absence.

43. Ms. Williams-Valentine responded that she would send Ms. Queen paperwork to assist her in obtaining FMLA leave on April 10, 2013.

44. No one sent Ms. Queen forms for FMLA leave until October 31, 2013.

45. Ultimately, the University offered Ms. Queen only two days of paid leave and no other assistance other than suggesting she take unpaid leave.

46. As a mother of a young child, Ms. Queen could not afford to take unpaid leave.

### The University Retaliates Against Ms. Queen for Her Complaints

47. On April 2, 2013, just days after Ms. Queen first complained about sexual harassment, Ms. Queen received a letter from Chief Kevin Hay stating that she did not pass her promotional examination and therefore was not eligible for promotion.

48. Ms. Queen asked Ms. Williams-Valentine for copies of her exam on at least two occasions. Ms. Williams-Valentine responded that she would get a copy of the exam and review the questions with Ms. Queen.

49. Ms. Queen never received a copy of her exam.

50. On April 11, 2013, Mr. Brown returned to work from a vacation.

51. That day, Mr. Brown glared at Ms. Queen when he saw her on campus.

52. Ms. Queen knew Mr. Brown had learned about her complaint against him based on the looks he gave her.

53. Ms. Queen felt so physically ill from the interaction with Mr. Brown that she took sick leave for the rest of the day.

54. By orders of Ms. Queen's medical doctors, Ms. Queen requested light duty in April 2013 which restricted her from working mandatory and voluntary overtime assignments.

55. Ms. Queen's asthma was aggravated by the stress.  She was prescribed medication to combat the added stress of being forced to work in the environment at the University.

56. Ms. Queen lost up to $550 per pay period because she was no longer able to work overtime while on light duty.

57. On April 18, 2013, Ms. Queen met with Ms. Pereira and Ms. Williams-Valentine again.

58. Ms. Queen told Ms. Periera and Ms. Williams-Valentine that her doctor recommended that she be placed on light duty due to the stress she was suffering.

59. From April 18 until December 21, 2013, Ms. Queen reported to the Mount Vernon campus, where she still had some contact with Mr. Brown.

60. Since the University had not made any efforts to separate Ms. Queen from Mr. Brown, she submitted an application for a University Police Dispatcher position on April 28, 2013 so she would not have to work with Mr. Brown.

61. The University rejected Ms. Queen for the position and informed Ms. Queen that she did not have the proper certifications for the position.

62. None of the University Police Dispatchers at the time had the proper certifications for the position.

63. On May 15, 2013, Ms. Queen received a letter from the University stating the University no longer employed Mr. Gibbs.  The letter provided no explanation for the separation.

64. On June 13, 2013, the University issued Ms. Queen a performance evaluation, which stated that she "socialized excessively" in the workplace.

65. In June 2013, as a result of the working environment at the University, Ms. Queen suffered a panic attack at work.

66. Ms. Queen had to go to the hospital as a result of her panic attack.

67. On July 11, 2013, Ms. Queen emailed Chief Hay and told him she was no longer able to work the A shift due to medical reasons and requested a transfer to the B shift.

68. Chief Hay did not acknowledge or respond to her email until she emailed him again on November 15, 2013.

69. In his response on November 15, 2013, Chief Hay said that she could be transferred to the B shift if she provided him a doctor's note saying she no longer needed to be on light duty.

70. On July 26 and 27, 2013, the University ordered Ms. Queen to work emergency details even though Ms. Queen was on light duty.

71. The University threatened to discipline Ms. Queen for insubordination if she did not report to the emergency details.

72. Requiring Ms. Queen to work emergency details while on light duty violated the University's Standard Operating Procedure.

73. In July 2013, the University asked Ms. Queen to serve as a witness for GWPD in a panel hearing regarding Mr. Ladson's termination.

74. On August 1, 2013, Ms. Queen testified at the panel hearing.

75. During the panel hearing, Chief Hay acknowledged the fact that Ms. Queen had been alienated from her fellow coworkers during the investigations of Mr. Ladson and stressed how much Mr. Ladson's behavior affected Ms. Queen's employment and emotional state.

76. Chief Hay and the University also used a picture of Mr. Ladson making bodily contact with Ms. Queen while he was her field-training officer.

77. Immediately following the hearing, Ms. Queen did not receive any help or acknowledgement from Chief Hay or the University regarding the harassment she had endured.

78. In August 2013, Ms. Queen applied a second time for a University Police Dispatcher position.

79. The University again rejected Ms. Queen for the position and informed Ms. Queen that it could not give Ms. Queen the position because her brother works as the Sergeant of Communications for the University.

80. The University's "Nepotism in Employment" policy grants the University discretion to determine the applicability of the policy on a case-by-case basis, but the University did not do so prior to rejecting Ms. Queen's application.

81. The University did not investigate Mr. Brown's harassment of Ms. Queen until October 2013, even though Ms. Queen complained about Mr. Brown's harassment and requested to be separated from him many times since March 2013.

82. During the University's investigation of Mr. Gibbs, Ms. Queen provided a written statement to Ms. Pereira in which she described both Mr. Gibbs's and Mr. Brown's harassment of Ms. Queen.

83. Ms. Queen also met with Ms. Pereira and Ms. Williams-Valentine multiple times during the investigation of Mr. Gibbs in April and May of 2013.

84. During each meeting in April and May of 2013, Ms. Queen discussed Mr. Brown's harassment and told them that he made her feel uncomfortable by repeatedly asking her out on dates and following her while she worked on the A shift.

85. During each meeting in April and May of 2013, Ms. Queen also told Ms. Pereira and Ms. Williams-Valentine about the stress she was suffering due to the harassment by both Mr. Gibbs and Mr. Brown.

86. In or around October 2013, Ms. Queen told Ms. Pereira and Ms. Williams-Valentine that she had a panic attack in June 2013 at work that was so severe she had to go to the hospital.

87. In or around October 2013, Ms. Queen told Ms. Pereira and Ms. Williams-Valentine about April 11, 2013 when she felt physically ill when she saw Mr. Brown and had to take sick leave.

88. On October 22, 2013, Ms. Queen met with Ms. Pereira, Ms. Williams-Valentine, and Senior Counsel of the University, Susan Kaplan.

89. Ms. Queen again summarized her complaint and experience regarding Mr. Brown.

90. Ms. Queen told Ms. Pereira, Ms. Williams-Valentine, and Ms. Kaplan that the events had hindered her from fully performing her duties as an officer with GWPD.

91. Ms. Queen provided a list of witnesses who could give further insight on how Mr. Brown and the University's behavior had affected her professionally and personally.

92. On November 12, 2013, Mr. Brown approached Ms. Queen's brother, who works as the Sergeant of Communications for the University, and stated in reference to Ms. Queen, "I don't know why she is doing this" and "she only has a job because of me."

93. On November 16, 2013, Ms. Queen received a performance evaluation from Corporal Knight.

94. Mr. Knight told Ms. Queen that the original performance evaluation he had intended to give her had rated her higher in several categories, but that Mr. Brown had ordered him to lower her ratings in categories 31, 60, 64, and 66.

95. On December 3, 2013, Ms. Kaplan gave Ms. Queen the option of transferring to the B shift and working under a new supervisor or remaining on light duty.

96. Ms. Kaplan notified Ms. Queen that she would only be permitted to transfer to the B shift if she presented medical documentation stating that she was medically able to return to full duty.

97. On December 14, 2013, Ms. Queen formally declined the transfer to the B shift because her physician was revisiting her medical condition and she was not prepared to make a determination without further medical information as to whether she was capable of returning to full duty.

98. On December 14, 2013, Ms. Queen informed Chief Hay that she would not be participating in the promotional exam on December 15, 2013, because the time and location of the exam conflicted with the agreement that she was not to be in contact with Mr. Brown.

99. On or around December 20, 2013, Ms. Queen received the findings of the investigation into her allegations of sexual harassment against Mr. Brown.

100.    The University concluded Mr. Brown had not committed sexual harassment.

<u>The University Constructively Discharges Ms. Queen</u>

101.    Ms. Queen requested and received FMLA leave from December 21, 2013 to March 17, 2014.

102.    Ms. Queen's physician diagnosed Ms. Queen with a mood disorder, anxiety disorder, and post-traumatic stress disorder.

103.    In Ms. Queen's FMLA paperwork, Ms. Queen's physician specified that her medical condition was work-related and that she did not feel physically safe in the workplace.

104.    On February 2, 2014, Ms. Queen's counsel wrote to Ms. Kaplan to alert her to Ms. Queen's concerns regarding her safety at the University.  Specifically, Ms. Queen's counsel notified Ms. Kaplan that Ms. Queen was concerned about the live ammunition found in Brown's desk.  The University is unarmed by order of the President and Board of Trustees.

105.    Ms. Queen's counsel sought assurances that the University would take steps to protect her upon her return to work from FMLA leave.

106.    Ms. Kaplan responded that Ms. Queen was "misinformed" and that she would not provide a substantive response to Ms. Queen's claims.

107.    On March 25, 2014 after over two years of harassment and over one year of the University's inaction, Ms. Queen resigned from her position with GWPD because her working conditions were so intolerable that she could no longer endure them and she was justifiably concerned that the University would not provide her with a safe working environment.

108.    On November 26, 2013, Ms. Queen filed charges against the University with the D.C. Office of Human Rights and the Equal Employment Opportunity Commission for sex discrimination and retaliation.  Ms. Queen also included allegations of common law battery and common law negligent supervision.

109.    On May 1, 2014, Ms. Queen filed an amended charge against the University with the

D.C. Office of Human Rights and the Equal Employment Opportunity Commission adding

an allegation of constructive discharge.

110.    On November 21, 2014, Ms. Queen obtained a right-to-sue letter from the DCOHR and

the EEOC.

**STATEMENT OF CLAIMS**

**COUNT I: SEX DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL
RIGHTS ACT OF 1964 AND THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT
OF 1977**

111.    Ms. Queen incorporates all the allegations contained in paragraphs 1-110 as if stated

herein.

112.    Under Title VII and the DCHRA, it is an unlawful employment practice for an employer

to discriminate against any individual with respect to the terms, conditions, or privileges of

employment because of an individual's sex.  42 U.S.C. § 2000e-2(a); D.C. Code § 2-1401.1.

113.    Discrimination with respect to the terms, conditions or privileges of employment on the

basis of sex includes sexually hostile work environment.  *See Meritor Savs. Bank. FSB v.

Vinson*, 477 U.S. 57, 65 (1986).

114.    Ms. Queen was subjected to unwelcome, offensive, and harassing sexually discriminatory

conduct during her employment with Defendant which was perpetrated upon her by Mr.

Brown and Mr. Gibbs and this conduct was based upon and directed at Ms. Queen by reason

of her sex.

115.    Ms. Queen noticed Defendant, which was otherwise aware, of the sexually harassing and

discriminatory conduct, but Defendant failed to take any appropriate corrective action.

116.    This sexually harassing and discriminatory conduct was sufficiently severe and pervasive so as to unreasonably interfere with Ms. Queen's physical health and work performance and so as to create an intimidating, hostile, and offensive working environment.

117.    During the times references herein, Ms. Queen was subjected to sexually explicit comments and romantic advances and was the subject of multiple false rumors of having romantic and sexual relationships with co-workers and supervisors.  Defendant did not take corrective action.

118.    Said comments and harassment ruined Ms. Queen's reputation and credibility and created an atmosphere of hostility which severely damaged the reputation in the eyes of her co-workers and supervisors.

119.    Ms. Queen was a victim of retaliatory conduct on the part of Defendant.  This conduct was ongoing and pervasive and constituted a "continuing violation" of Ms. Queen's rights. During the course of her employment, Ms. Queen was forced to work in a sexually discriminatory and hostile environment.

120.    Other security officers complained to Defendant regarding harassing behavior toward Ms. Queen during the times referenced in Ms. Queen's complaint, yet no corrective action was taken.

121.    As a direct and proximate result of the acts and omissions of Defendant as described above, Ms. Queen suffered loss of pay and benefits, including, but not limited to, salary, bonuses, health insurance, diminished future earning capacity, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

**COUNT II: RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 AND THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT OF 1977**

122.    Ms. Queen incorporates all the allegations contained in paragraphs 1-121 as if stated

herein.

123.    Under Title VII and the DCHRA, it is an unlawful employment practice for an employer

to retaliate against any individual on account of having exercised any right protected under

the statutes or because that person has opposed any practice made unlawful by the statutes.

42 U.S.C. § 2000e-3(a); D.C. Code. § 2-1402.61.

124.    As alleged herein, Defendant, by and through its officers, managing agents, and/or its

supervisors, illegally retaliated against Ms. Queen by unjustly subjecting her to unjust

scrutiny and failing to promote her or transfer her to another position solely because she had

reported the aforementioned sexual harassment.  Defendant had no legitimate reasons for any

such act.  Each said act of retaliation is in violation of Title VII and the DCHRA.

125.    The individuals involved in the investigation had knowledge of Ms. Queen's exercise of

her statutory rights and opposition to discriminatory harassment based on their receipt of her

complaints.

126.    Ms. Queen is informed and believes, and based thereon alleges, that Defendant's conduct

as described above was willful, wanton, malicious, and done in disregard for the safety and

well-being of Ms. Queen.

127.    As a direct and proximate result of the acts and omissions of Defendant as described

above, Ms. Queen suffered loss of pay and benefits, including, but not limited to, salary,

bonuses, health insurance, diminished future earning capacity, emotional pain and suffering,

inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and

nonpecuniary losses.

## COUNT III: CONSTRUCTIVE DISCHARGE IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 AND THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT OF 1977

128.    Ms. Queen incorporates all the allegations contained in paragraphs 1-127 as if stated

herein.

129.    Under Title VII and the DCHRA, an employer is liable for constructive discharge if the

harassment or discrimination was "so intolerable that a reasonable person in the same

position would have felt compelled to resign." *See Penn. St. Police v. Suders*, 542 U.S. 129

(2004).

130.    Ms. Queen was subjected to unwelcome, offensive, and harassing sexually discriminatory

conduct during her employment with Defendant, which was perpetrated upon her by Mr.

Brown and Mr. Gibbs, and this conduct was based upon and directed at Ms. Queen by reason

of her sex.

131.    Ms. Queen noticed Defendant, which was otherwise aware, of the sexually harassing and

discriminatory conduct, but Defendant failed to take any appropriate corrective action.

132.    This sexually harassing and discriminatory conduct was sufficiently severe and pervasive

so as to unreasonably interfere with Ms. Queen's physical health and work performance and

so as to create an intimidating, hostile, and offensive working environment.

133.    During the times references herein, Ms. Queen was subjected to sexually explicit

comments and romantic advances and was the subject of multiple false rumors of having

romantic and sexual relationships with co-workers and supervisors.  Defendant did not take

correct action for such conduct.

134.   Said comments and harassment ruined Ms. Queen's reputation and credibility and created an atmosphere of hostility which severely damaged the reputation in the eyes of her co-workers and supervisors.

135.   Ms. Queen was a victim of retaliatory conduct on the part of Defendant.  This conduct was ongoing and pervasive and constituted a "continuing violation" of Ms. Queen's rights.  During the course of her employment, Ms. Queen was forced to work in a sexual discriminatory and hostile environment.

136.   Other security officers complained to Defendant regarding harassing behavior toward Ms. Queen during the times referenced in Ms. Queen's complaint, yet no corrective action was taken.

137.   Defendant had notice of Ms. Queen's intolerable conditions, condoned Ms. Queen's intolerable conditions, and failed to take any corrective action.

138.   Ms. Queen had no other choice but to resign because of Defendant's intolerable conditions, which included sexually hostile work environment and retaliation.

## COUNT IV: COMMON LAW BATTERY

139.   Ms. Queen incorporates all the allegations contained in paragraphs 1-138 as if stated herein.

140.   In the District of Columbia, the tort of battery is "an intentional act that causes a harmful or offensive bodily contact." *Holder v. District of Columbia*, 700 A.2d 738, 741 (D.C. Cir. 1997).

141.   From January 2012 to May 2013, Mr. Gibbs was Ms. Queen's supervisor and an agent of Defendant.

142.   In February 2013, Mr. Gibbs intentionally grabbed and held Ms. Queen against her will on at least one occasion.

143.   Ms. Queen made it clear that Mr. Gibbs's contact was unwanted and offensive.

144.   Mr. Gibbs ignored Ms. Queen's demands to be let free.

145.   In March 2013, Mr. Gibbs put his leg on Ms. Queen, demanded she turn around, and picked a piece of lint off of her shoulder.

146.   Ms. Queen made it clear that Mr. Gibbs's contact was unwanted and offensive.

147.   Defendant knew that Mr. Gibbs intentionally made physical contact with Ms. Queen that was harmful and offensive because Ms. Queen reported it to Defendant several times from April 2013 and March 2014.

148.   As a direct and proximate result of the acts and omissions of Defendant as described above, Ms. Queen suffered loss of pay and benefits, including, but not limited to, salary, bonuses, health insurance, diminished future earning capacity, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

## COUNT V: COMMON LAW NEGLIGENT SUPERVISION

149.   Ms. Queen incorporates all the allegations contained in paragraphs 1-148 as if stated herein.

150.   In the District of Columbia, an employer is liable for negligent supervision when the employer "knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with actual or constructive knowledge, failed to adequately supervise the employee." *Godfrey et al v. Iverson et al*, 559 F.3d 569,

571 (D.C. Cir. 2009) (quoting *Brown v. Argenbright Sec. Inc.*, 782 A.2d 752, 760 (D.C. Cir. 2001)).

151.    Defendant had actual knowledge that Mr. Gibbs behaved in a dangerous or otherwise incompetent manner because Ms. Queen and other security officers reported to Defendant that Mr. Gibbs battered and sexually harassed Ms. Queen.

152.    Defendant did nothing to address Mr. Gibbs's conduct and continued to employ him up until May 2013.

153.    Defendant had actual knowledge that Mr. Gibbs behaved in a dangerous or otherwise incompetent manner because Ms. Queen reported to Defendant that Mr. Brown sexually harassed Ms. Queen several times starting in March 2013.

154.    Defendant only started investigating Mr. Brown's harassment of Ms. Queen in October 2013, despite Ms. Queen's repeated complaints throughout the previous six months.

155.    Defendant required Ms. Queen to continue to work with Mr. Brown for six months after she complained that he was sexually harassing her.

156.    As a direct and proximate result of the acts and omissions of Defendant as described above, Ms. Queen suffered loss of pay and benefits, including, but not limited to, salary, bonuses, health insurance, diminished future earning capacity, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other pecuniary and nonpecuniary losses.

## PRAYER FOR RELIEF

**NOW, WHEREFORE,** Ms. Queen prays this Court to:

a.    Enter judgment in her favor against Defendant for discrimination, retaliation, constructive discharge, battery, and negligent supervision;

b.  Award Ms. Queen compensation of lost wages;

c.  Award Ms. Queen compensatory damages in an amount to be shown at trial, but in no

event less than $100,000;

d.  Award Ms. Queen punitive damages in an amount to be shown at trial;

e.  Award Ms. Queen reimbursement of the attorneys' fees and costs she has expended in

litigating this matter; and

f.  Grant her such other and further relief as justice may require.

**JURY DEMAND**

Ms. Queen seeks trial by jury on all matters and issues that can be so tried.


Dated: February 18, 2015                           Respectfully submitted,

_____

Ari M. Wilkenfeld (Bar No. 461063)
The Wilkenfeld Law Group
1726 Connecticut Avenue, NW
Suite 200
Washington, DC 20009
T: 202.765.2253
F: 202.600.2792
ari@wilkenfeldlaw.com


Rosalind H. Herendeen (Bar No. 1021518)
The Wilkenfeld Law Group
1726 Connecticut Avenue, NW
Suite 200
Washington, DC 20009
T: 202.765.2253
F: 202.600.2792
rosalind@wilkenfeldlaw.com